No. 23-13649

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

TIMOTHY BURKE,

*Appellant,*

v.

UNITED STATES OF AMERICA,

*Appellee.*

On Appeal from the United States District Court
for the Middle District of Florida, Tampa Division, No. 8:23-mc-00014-WFJ-SPF

## BRIEF OF AMICUS CURIAE THE REPORTERS COMMITTEE
## FOR FREEDOM OF THE PRESS IN SUPPORT OF NEITHER PARTY

Bruce D. Brown
  *Counsel of Record*
Katie Townsend
Gabe Rottman*
Julia Dacy*
REPORTERS COMMITTEE FOR
  FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300

* *Of counsel*

**CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT**

The Reporters Committee for Freedom of the Press is an unincorporated

association of reporters and editors with no parent corporation and no stock.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit

Rule 26.1, the undersigned certifies that, in addition to the persons listed in the

certificate of interested persons filed by the parties, the following persons (amici

curiae, their parent corporations, publicly held corporations that own 10% or more

of the stock, and their counsel) are known to have an interest in the outcome of this

case:

1. Brown, Bruce D.

2. Dacy, Julia

3. Reporters Committee for Freedom of the Press

4. Rottman, Gabe

5. Townsend, Katie

Dated:  January 2, 2024

/s/ Bruce D. Brown
Bruce D. Brown
*Counsel of Record*
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS

# TABLE OF CONTENTS

**Page:**

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ............................................................................C-1

TABLE OF AUTHORITIES ................................................................... ii

IDENTITY OF AMICUS CURIAE, ITS INTEREST IN THE CASE, AND THE SOURCE OF ITS AUTHORITY TO FILE ..............................................1

RULE 29(A)(4)(e) STATEMENT .........................................................2

SUMMARY OF ARGUMENT ...............................................................3

ARGUMENT ........................................................................................4

I.  Under the First Amendment and laws protecting newsgathering, the correct approach for courts, legislatures, and other government bodies is to apply a functional understanding of "journalist." .......................................4

II.  A functional understanding of press is necessary to protect the important work of stringers and freelancers who are essential to the newsgathering process. ......................................................................................11

CONCLUSION ...................................................................................15

CERTIFICATE OF COMPLIANCE WITH RULE 32(G) ....................16

# TABLE OF AUTHORITIES

**Page(s):**

**Cases:**

*Cause of Action v. FTC*,
  799 F.3d 1108 (D.C. Cir. 2015) ........................................................... 7

*First Nat'l Bank v. Bellotti*,
  435 U.S. 765 (1978) ........................................................................ 5

*In re Mahtani, Ph.D.*,
  No. 27-17-11589, 2017 WL 5571221 (Minn. Dist. Ct. Sept. 25, 2017) .............. 10

*Lovell v. City of Griffin*,
  303 U.S. 444 (1938) ..................................................................... 4, 5

**Statutes:**

28 C.F.R. § 50.10 ........................................................................ 7, 9

42 U.S.C. § 2000(aa) ....................................................................... 7

5 U.S.C. § 552(4)(A)(ii)(II) ............................................................... 7

Fla. Stat. § 90.5015(1)(a) ................................................................. 3

Minn. Stat. § 595.023 ..................................................................... 10

O.C.G.A. § 24-5-508 ....................................................................... 10

**Other Authorities:**

Alexandra Bruell, *Your Local Newspaper Might Not Have a Single
  Reporter*, Wall St. J. (Nov. 24, 2023) .................................................. 12

Amir Vera, *San Francisco Police Chief Says Raid on Journalist's Home
  May Have Violated California Shield Law*, CNN (May 27, 2019) ........................... 14

Bruce D. Brown and Gabe Rottman, *The Nuts and Bolts of the Revised
  Justice Dept. News Media Guidelines*, Lawfare (May 23, 2023) ........................... 9

Candice Norwood, *How the AP Calls Races and What to Expect on Election Night*, PBS NewsHour (Oct. 27, 2020).................................................13

*Counting the Vote*, Associated Press (last visited Dec. 19, 2023)...........................12

David Bauder, *Decline in Local News Outlets Is Accelerating Despite Efforts to Help*, Associated Press (Nov. 16, 2023) ..............................................12

Dep't of Justice, Policy and Statutory Enforcement Unit, News Media Policy Consultation Form (last updated July 20, 2016)......................................................8

Eli Rosenberg, *A Judge Signed a Warrant to Search a Journalist. But Police Didn't Tell Her the Whole Story*, Wash. Post (July 23, 2019)............................13

Ken Ritter, *Nevada Court Adds Bloggers to Reporters Source Shield Law*, Associated Press (Dec. 6, 2019) .............................................................................5

Letter from Reporters Comm. for Freedom of the Press and 15 News Organizations to Senate Urging Passage of PRESS Act (Dec. 7, 2022) ...............6

Luke Henkhaus, *San Francisco Expected to Reach $369,000 Settlement with Journalist Bryan Carmody Over Police Raid*, Reporters Comm. for Freedom of the Press (March 5, 2020).................................................................14

Marc Tracy, *San Francisco Police Call Journalist Possible 'Co-Conspirator' in Report Leak*, N.Y. Times (May 22, 2019) ...........................13, 14

Melina Delkic, *What Makes a Good Editor? A Long List of Stringers*, N.Y. Times (Aug. 3, 2017) ..........................................................................................11

*Mitchell S. Jackson, Freelance Contributor, Runner's World*, The Pulitzer Prize (last visited Dec. 19, 2023)........................................................................12

Nadja Drost, *When Can We Really Rest?*, Cal. Sunday Mag. (Apr. 2, 2020).........12

Natacha Yazbeck, *Behind the Byline: The Human Toll of How We Still Get News Out of Syria*, Colum. J. Rev. (June 16, 2021) ...........................................11

*New Justice Department Policy Marks 'Historic' Shift in Press Protection*, Reporters Comm. for Freedom of the Press (Oct. 26, 2023) .................................8

Press Release, U.S. Dep't of Just., Attorney General Garland Announces
Revised Justice Department News Media Policy (Oct. 26, 2022)..........................8

S. 2074, 118th Cong. (2023) ....................................................................6

Sandra E. Garcia, *San Francisco Police Chief Apologizes for Raid of
Journalist's Home*, N.Y. Times (May 25, 2019) ..................................14

Sonja West, *Awakening the Press Clause*, 58 UCLA L. Rev. 1025 (2011) ...5, 6, 10

U.S. Dep't of Just., Just. Manual, § 9-13.400 (A)(1) ...............................8

**Rules:**

Fed. R. App. P. 29(a)(2) ..........................................................................1

## IDENTITY OF AMICUS CURIAE, ITS INTEREST IN THE CASE, AND THE SOURCE OF ITS AUTHORITY TO FILE

Amicus the Reporters Committee for Freedom of the Press is an unincorporated nonprofit association founded by leading journalists and media lawyers in 1970 when the nation's news media faced an unprecedented wave of government subpoenas forcing reporters to name confidential sources. Today, its attorneys provide pro bono legal representation, amicus curiae support, and other legal resources to protect First Amendment Freedoms and the newsgathering rights of journalists. All parties have consented to the filing of this brief. *See* Fed. R. App. P. 29(a)(2).

As an organization that works to defend the rights of journalists, amicus has a strong interest in ensuring that constitutional and statutory protections against the seizure of journalists' work product and documentary material are correctly recognized and applied. These protections are vital to journalists' ability to effectively report on matters of importance to the public. Amicus is a proponent of a functional understanding of journalism that encompasses and provides protection for a wide array of newsgatherers who collect information with the intent to disseminate it to the public. An inquiry that focuses too narrowly on a person's professional status could improperly exclude bona fide journalistic activity from legal protections. For the reasons set forth in this amicus curiae brief, amicus writes to urge the Court to apply this broad functional approach in this case.

## RULE 29(A)(4)(e) STATEMENT

No party's counsel authored any part of this amicus curiae brief. No person other than amicus or their counsel contributed money intended to fund the preparation or submission of this amicus curiae brief.

# SUMMARY OF ARGUMENT

In its briefing before the district court, the United States opposed Appellant Tim Burke's motion, the denial of which is before this Court on appeal, in part by citing the Florida reporter's privilege law to suggest that Appellant Tim Burke may not be a "professional journalist." *See* Resp. in Opp'n to Burke's Mot. to Unseal Probable Cause Aff. and For Return of Property at 11–12, *Burke v. United States*, No. 8:23-mc-00014 (M.D. Fla. Aug. 9, 2023), ECF No. 33 (citing Fla. Stat. § 90.5015(1)(a)). The government stated that although, "Burke at one time may have been a professional journalist, the United States has been unable to find any evidence that Burke has regularly published under his own byline," as a salaried employee or independent contractor of a news organization, and that Burke has "for some years primarily categorized his work as that of a consultant." *Id.* at 12.

Amicus takes no position on whether Burke is or isn't a "professional journalist." But amicus respectfully writes on one narrow issue: the importance of using a functional approach to determine who qualifies for protections for newsgathering and reporting. That approach looks at the actions at issue—whether newsworthy information has been gathered for dissemination to the public—as opposed to the professional standing of the person seeking the privilege. Using this functional lens is essential for two reasons. One, it avoids concerns that may materialize when judges, legislators, or other government officials decide who

3

qualifies for protections for the "press" based on status alone, which contains echoes of the hated English system of government licensing of printers that led to ratification of the First Amendment. Two, it ensures that technological advances or other innovations in the practice of newsgathering and publishing do not preclude protections for acts of journalism by non-traditional journalists.

Application of a functional test is also in-line with how Congress and many state legislatures have tackled the problem of determining who qualifies for legal protections for newsgathering. And it is consistent with the approach of the Justice Department's media subpoena guidelines as memorialized in the Code of Federal Regulations. To the extent this definitional question is at issue in this appeal, amicus respectfully urges the Court to apply a functional approach.

## ARGUMENT

### I. Under the First Amendment and laws protecting newsgathering, the correct approach for courts, legislatures, and other government bodies is to apply a functional understanding of "journalist."

When called upon to determine who qualifies for First Amendment protections as the "press," the U.S. Supreme Court has consistently avoided a definition keyed to the professional status of the speaker. *See, e.g.*, *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) ("The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."). The concern over an alternative approach reflects the fact that the

revolutionary "struggle for the freedom of the press was primarily directed against the power of the licensor." *Id.* at 451. And it likewise incorporates the recognition that for the government to apply protections based on artificial distinctions such as professional status would vest government with that licensing power. *See First Nat'l Bank v. Bellotti*, 435 U.S. 765, 801 (1978) (Burger, C.J., concurring) ("The very task of including some entities within the 'institutional press' while excluding others, whether undertaken by legislature, court, or administrative agency, is reminiscent of the abhorred licensing system of Tudor and Stuart England—a system the First Amendment was intended to ban from this country.").

A functional definition also accommodates the reality that the news business, both in terms of the technology of publishing and the role of the reporter, is complex and ever-changing. In the context of state shield statutes, the strongest definitions avoid terms that risk becoming obsolete and shun arbitrary hair-splitting (like digital versus print publication) that exclude from protection some public interest journalism. *See, e.g.*, Ken Ritter, *Nevada Court Adds Bloggers to Reporters Source Shield Law*, Associated Press (Dec. 6, 2019), https://perma.cc/2LZJ-YHKQ; Sonja West, *Awakening the Press Clause*, 58 UCLA L. Rev. 1025, 1063 (2011) (noting concern with "medium of communication or news affiliation"-based definitions). To be sure, crafting a functional definition of "press" can still pose difficulties. *Id.* at 1068 ("There is no

dispute that the search for a workable definition of the press is filled with minefields.").  But the best efforts to do so to date "focus on the unique functions of the press qua press."  *Id.*

For instance, currently pending in Congress is the PRESS Act, a federal shield bill that would enact robust protections limiting when the federal executive and judicial branches can use compulsory process to demand records from journalists.  *See* S. 2074, 118th Cong. (2023).  The bill includes a broad, functional definition focusing on the activity being performed: "The term 'covered journalist' means a person who regularly gathers, prepares, collects, photographs, records, writes, edits, reports, investigates, or publishes news or information that concerns local, national, or international events or other matters of public interest for dissemination to the public."  *Id.* § 2(1).  The PRESS Act definition does not tie itself to a particular medium or professional status, nor would it require, as in some previous federal shield law proposals, that covered reporters rely on journalism for their livelihoods.  Letter from Reporters Comm. for Freedom of the Press and 15 News Organizations to Senate Urging Passage of PRESS Act (Dec. 7, 2022), https://perma.cc/5PFM-T6F8.

The Privacy Protection Act of 1980, 42 U.S.C. § 2000aa, is also structured around the activity of journalism rather than the status of its practitioners.  That law, which limits when federal, state, and local law enforcement can execute

search warrants to seize "work product" or "documentary materials," applies to persons "reasonably believed to have a purpose to disseminate to the public a newspaper, book, broadcast, or other similar form of public communication."  42 U.S.C. § 2000(aa)(a)-(b).  So does the federal Freedom of Information Act in a provision governing reduced fees for the press.  It defines "representative of the news media" as "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience."  5 U.S.C. § 552(4)(A)(ii)(II).  Courts have applied that definition to entities engaged in journalistic activities but which may not be a part of the institutional press.  *See, e.g.*, *Cause of Action v. FTC*, 799 F.3d 1108 (D.C. Cir. 2015).

The Justice Department has also long eschewed defining who qualifies for protections in its "news media guidelines," the internal policy that restricts when and how the department can use compulsory legal process to demand information from the news media for use in its investigations.  28 C.F.R. § 50.10.  The guidelines, first implemented in 1970, put in place various procedural guardrails, including high-level approval, requirements that all reasonable attempts be made to obtain records from non-media sources first, and advance notice to affected journalists and news organizations—all of which are designed to prevent investigative steps that improperly intrude into the autonomy of the newsroom.

In the Justice Manual section providing guidance on a 2015 revamp of the policy, the Department emphasized that "whether an individual or an entity is a member of the news media is a fact-specific inquiry, and should be determined on a case-by-case basis." U.S. Dep't of Just., Just. Manual, § 9-13.400 (A)(1). The Department also mandated consultation with the Criminal Division in cases where there was a question about whether an individual or entity qualified as a member of the news media. *Id.* § 9-13.400(M)(1)(i). As part of that consultation, the Department identified various factors relevant to that question in a form to be submitted to the Criminal Division. These factors were also largely functional, including, for instance, whether the individual or entity "regularly engages in investigation and newsgathering." Dep't of Justice, Policy and Statutory Enforcement Unit, News Media Policy Consultation Form (last updated July 20, 2016), https://www.rcfp.org/wp-content/uploads/2024/01/News-Media-Policy-Consultation-Form.pdf.

In 2022, the Department amended the guidelines to replace the previous balancing test with a bright-line rule barring the use of process against journalists acting "within the scope of newsgathering." Press Release, U.S. Dep't of Just., Attorney General Garland Announces Revised Justice Department News Media Policy (Oct. 26, 2022); *New Justice Department Policy Marks 'Historic' Shift in Press Protection*, Reporters Comm. for Freedom of the Press (Oct. 26, 2023),

https://www.rcfp.org/doj-news-media-guidelines-policy/.  "Newsgathering" is the "process by which a member of the news media collects, pursues, or obtains information or records for purposes of producing content intended for public dissemination."  28 C.F.R. § 50.10(b)(2)(ii).  In keeping with this functional approach, the guidelines, as codified in the Code of Federal Regulations, do not define who is a journalist.[1]  And, based on its annual reports on the 28 C.F.R. § 50.10 rule, the Department has appeared to err on the side of caution, applying the guidelines to individuals or entities who may be engaged in the collection of information for dissemination to the public, but who are not traditional news media.  Bruce D. Brown and Gabe Rottman, *The Nuts and Bolts of the Revised Justice Dept. News Media Guidelines*, Lawfare (May 23, 2023), https://perma.cc/7J2V-UV9N.

Additionally, some state shield laws apply a broad, functional definition to ensure they protect the newsgathering function, regardless of who performs it.  The Minnesota Free Flow of Information Act, for instance, includes a definition similar to the proposed federal PRESS Act.  That is, it applies to any "person who is or has been directly engaged in the gathering, procuring, compiling, editing or publishing of information for the purpose of transmission, dissemination or publication to the

---

[1]     The department has not yet promulgated a revised section of the Justice Manual to reflect the 2022 changes.

public." Minn. Stat. § 595.023. And Minnesota courts have applied the statute broadly to cover non-traditional and alternative news media. *See In re Mahtani, Ph.D.*, No. 27-17-11589, 2017 WL 5571221, at *5 (Minn. Dist. Ct. Sept. 25, 2017) (applying the shield law to a publisher and founder of a communications firm and observing that "[t]he wide-cast net of the [MFFIA] would appear to catch not only reporters and journalists working in traditional news media, but also internet bloggers, unpaid news-gatherers, even public relations consultants as long as they were engaged in any of the enumerated activities" in the statute). Several other states likewise emphasize function in determining who qualifies for protection. *See, e.g.*, O.C.G.A. § 24-5-508 (applying reporter's privilege in Georgia to "[a]ny person, company, or other entity engaged in the gathering or dissemination of news for the public through any newspaper, book, magazine, or radio or television broadcast, or electronic means . . . ."); West, *supra*, at 1065 n.250 (listing other state shield laws with broad definitions based on "news-related activities").

In sum, the best approach to deciding who qualifies for constitutional or legal protections for newsgathering and reporting is to look at the function being performed—that is, whether the individual or entity is engaged in the gathering of information for dissemination to the public.

**II.    A functional understanding of press is necessary to protect the important work of stringers and freelancers who are essential to the newsgathering process.**

Freelance journalists—including "stringers"—play a central role in modern newsgathering and reporting.  Stringers are not permanent staff but are paid to work as-needed to provide "string," or content, for breaking news stories for dissemination to the public.  Melina Delkic, *What Makes a Good Editor? A Long List of Stringers*, N.Y. Times (Aug. 3, 2017), https://perma.cc/MV7Y-ZJWC. Editors at major media outlets often have large networks of stringers across the world who can help with coverage in places where they do not have a permanent presence, or where it can be difficult for on-staff reporters to travel.  Natacha Yazbeck, *Behind the Byline: The Human Toll of How We Still Get News Out of Syria*, Colum. J. Rev. (June 16, 2021), https://perma.cc/XWH4-SMWK.  While the exact role of stringers will vary from news organization to news organization, their basic responsibility is to gather information, video footage, interviews, and other material, which they then sell to news publications.  Delkic, *supra*.  Often, they will provide this type of "raw" reporting rather than send in fully-written pieces. *Id.*  They will thus not always receive bylines for their contributions.  *Id.*

Further, as local news outlets continue to struggle—with the United States losing newspapers at a rate of two-and-a-half per week—the importance of stringers and freelancers has only increased.  *See* David Bauder, *Decline in Local*

*News Outlets Is Accelerating Despite Efforts to Help*, Associated Press (Nov. 16, 2023), https://perma.cc/HT8U-UVGL.  Resources in newsrooms across the country are scarce, and the availability of high-quality information gathered by a stringer could mean the difference between covering an important local story or not.  *See* Alexandra Bruell, *Your Local Newspaper Might Not Have a Single Reporter*, Wall St. J. (Nov. 24, 2023), https://perma.cc/2F8F-BKYF (noting that many local papers increasingly rely on freelancers for local reporting).

Freelance journalists have produced essential accountability reporting in recent years.  In 2021, for instance, freelancer Nadja Drost won a Pulitzer Prize for reporting on migrants crossing the Darien Gap in efforts to reach the Mexican-American border.  *See* Nadja Drost, *When Can We Really Rest?*, Cal. Sunday Mag. (Apr. 2, 2020), https://perma.cc/3HU2-A4BC.  That same year, freelance contributor Mitchell S. Jackson also won a Pulitzer for feature writing for an essay in Runner's World on the killing of Ahmaud Arbery.  *Mitchell S. Jackson, Freelance Contributor, Runner's World*, The Pulitzer Prize (last visited Dec. 19, 2023), https://perma.cc/HAK6-D2T3.  In addition, stringers are essential to coverage of national elections.  *See Counting the Vote*, Associated Press (last visited Dec. 19, 2023), https://perma.cc/C47M-FF5P ("Shortly before the polls close, over 4,000 stringers report to county election centers."); Candice Norwood, *How the AP Calls Races and What to Expect on Election Night*, PBS NewsHour

(Oct. 27, 2020), https://perma.cc/7DLH-VFGP (noting that many major news outlets rely on AP data and race calls).

When government officials fail to apply a functional approach to determining who qualifies as a journalist, they run the risk of excluding stringers and other freelancers. For instance, in 2019, the San Francisco Police Department executed a search warrant at the home and office of Bryan Carmody, who works as a stringer gathering footage of various news events and packaging it for sale to news organizations. The warrants sought information about Carmody's source for a leaked police report. In the affidavit supporting the warrant, officers characterized Carmody as a "Freelance Videographer / Communications Manager," as he described himself on his LinkedIn profile, but omitted other information indicating that his work was journalistic. *See* Eli Rosenberg, *A Judge Signed a Warrant to Search a Journalist. But Police Didn't Tell Her the Whole Story*, Wash. Post (July 23, 2019), https://perma.cc/5PXJ-AF3K. Responding to public outcry, the police department initially sought to defend itself by trying to distinguish Carmody from traditional journalists. Marc Tracy, *San Francisco Police Call Journalist Possible 'Co-Conspirator' in Report Leak*, N.Y. Times (May 22, 2019), https://perma.cc/72P9-LQXS. In a statement, the department said that it had "learned that Mr. Carmody was offering to sell the stolen report" to

other news organizations and that he "was not employed by any of the news organizations who received the stolen report." *Id.*

After continued backlash, the police department backtracked, with the chief issuing an apology several days after the initial statement where the department suggested that Carmody's activity was not journalistic. *See* Sandra E. Garcia, *San Francisco Police Chief Apologizes for Raid of Journalist's Home*, N.Y. Times (May 25, 2019), https://perma.cc/72P9-LQXS. The chief said he was "concerned 'by a lack of due diligence by department investigators in seeking search warrants and appropriately addressing Mr. Carmody's status as a member of the news media.'" Amir Vera, *San Francisco Police Chief Says Raid on Journalist's Home May Have Violated California Shield Law*, CNN (May 27, 2019), https://www.cnn.com/2019/05/25/us/san-francisco-police-chief-journalist-raid/index.html. The department returned Carmody's equipment and materials. He filed a claim against the city of San Francisco, resulting in a sizeable settlement. Luke Henkhaus, *San Francisco Expected to Reach $369,000 Settlement with Journalist Bryan Carmody Over Police Raid*, Reporters Comm. for Freedom of the Press (March 5, 2020), https://perma.cc/G6VY-UEL6.

The fact that stringers furnish information to news organizations rather than publish or write their own stories does not strip them of their journalistic bona fides. To apply a too-narrow concept of journalism that would exclude them and

other freelancers from First Amendment or legal protections for newsgathering would impair the free flow of information to the public.

## CONCLUSION

For the foregoing reasons amicus respectfully urges the Court to consider the importance of a functional understanding of journalism in the application of First Amendment or other legal protections for newsgathering in this case.

Dated: January 2, 2024

Respectfully submitted,

/s/ Bruce D. Brown
Bruce D. Brown
   *Counsel of Record for Amicus Curiae*
Katie Townsend
Gabe Rottman*
Julia Dacy*
REPORTERS COMMITTEE FOR
   FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, D.C. 20005
Telephone: (202) 795-9300

*\* Of counsel*

# CERTIFICATE OF COMPLIANCE WITH RULE 32(G)

1.     This brief complies with the type-volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a) because this brief contains 3,055 words, excluding the parts of the brief exempted under Federal rule of Appellate Procedure 32(f).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  January 2, 2024

/s/ Bruce D. Brown
Bruce D. Brown
*Counsel of Record*
REPORTERS COMMITTEE FOR
    FREEDOM OF THE PRESS